# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
### *Southern Division*

|  |  |  |
|---|---|---|
| **ERIK B. CHERDAK**<br>149 Thurgood Street<br>Gaithersburg, Maryland 20878<br>(Montgomery County) | : | |
| | : | |
| | : | |
| | : | |
| *Plaintiff,* | : | **COMPLAINT** |
| | : | |
| | : | Civil No. **RWT 08 CV 0754** |
| *vs.* | : | |
| | : | |
| | : | |
| **PFIZER, INC., also trading as:**<br>    **PHARMACIA CORPORATION**<br>    **& G.D. SEARLE, LLC**<br>235 East 42nd Street<br>New York, NY 10017 | : | |
| | : | |
| | : | |
| | : | **JURY TRIAL REQUESTED** |
| | : | |
| Serve On: The Corporation Trust Inc.<br>300 E. Lombard St.<br>Baltimore, MD 21202 | : | |
| | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

-----------------------------------------------------

## COMPLAINT

***COMES NOW*** the Plaintiff, Erik B. Cherdak, *Pro Se*, and brings suit against Defendant, Pfizer, Inc., and for good cause states:

## THE PARTIES

1. Plaintiff, Erik B. Cherdak, at all times relevant hereto, has resided in Gaithersburg, Maryland, was prescribed and ingested the drug CELEBREX (scientifically known as "celecoxib") to his permanent detriment.

2. Defendant, Pfizer, Inc., a Delaware corporation, authorized to do and is doing business in the State of Maryland, with its principal place of business in New York, has committed a tort within the State of Maryland and may be served with process of this Court in accordance with Rule 4 of the Federal Rules of Civil Procedure through its registered agent in Maryland.

## JURISDICTION

3. This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (Diversity), as the amount in controversy exceeds $75,000 exclusive of interest and costs and because this action is brought by an individual who is a citizen of Maryland against Defendant, a Corporate entity formed in another State.

## VENUE

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391. Plaintiff purchased and ingested the products that form the basis of this lawsuit in the State of Maryland. At all relevant times herein, Defendant was in the business of designing, manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and selling its product, CELEBREX. Pfizer, Inc. at all times relevant hereto designed, developed, manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce the aforementioned prescription drug, CELEBREX. Defendant does substantial business in the State of Maryland and within this district, advertises in this district, received (and continues to receive) substantial compensation and profits from sales of CELEBREX in this district, and made material omissions and misrepresentations and breaches of warranties in this district – all to Plaintiff's detriment.

## FACTUAL ALLEGATIONS

5.  Defendant is in the business of designing, manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and selling its prescription drug product, CELEBREX. Defendant, at all times relevant hereto, designed, developed, manufactured, promoted, marketed, distributed, tested, warranted and sold CELEBREX in the State of Maryland and throughout the United States.

6.  Plaintiff, ingested CELEBREX as prescribed and provided by his doctors and as a result thereof, suffered a stroke in May, 2005. See Exhibit 1. And, for a period of over six months preceding up to the day he suffered his stroke, plaintiff was prescribed, given, and ingested both 600mg and 400mg per day dosages to treat his pain and inflammation symptoms associated with his chronic arthritis and acute Achilles tendon damage.  In fact and in addition, Plaintiff was provided CELEBREX ACUTE PAIN PACKS from his medical providers on the recommendation that such pain packs would hasten and "quicken" the drug's effectiveness.   See Exhibit 2.

7. At all times relevant herein, Plaintiff was unaware of the serious side effects and dangerous properties of CELEBREX  as set forth herein.

8. The product in question was designed, formulated, patented, marketed, sold, tested, warranted, and ultimately distributed by the Defendant as CELEBREX.

9. CELEBREX is in a class of drugs called non-steroidal anti-inflammatory drugs. CELEBREX was approved by the Food and Drug Administration for the treatment and management of symptoms of arthritis in adults.

10. Defendant originally refused to withdraw CELEBREX from the market, despite numerous scientific studies documenting greater than triple the risk of heart

attacks, strokes and death in connection with the use of CELEBREX.

11. Defendant materially breached its obligations to consumers and, in particular, to the Plaintiff, in terms of ensuring the safety of CELEBREX based on its design defects, Defendant's poor and unreasonable testing of CELEBREX, its sub-standard manufacturing techniques, Defendant's false and misleading warnings, its greedy over-zealous marketing practices in which Pfizer failed to warn doctors and, ultimately, patients, and in Defendant's failure to properly warrant the sale of CELEBREX.

12. Defendant expressly and/or impliedly warranted to the market, including the Plaintiff, by and through statements made by Defendant or its authorized agents or sales representatives, orally and in publications, package inserts and other written materials to the health care community, that CELEBREX was safe, effective, fit and proper for its intended use.   Nothing could be further from the truth.   CELEBREX caused and continues to strokes, like the one suffered by the Plaintiff.

13. Defendant was aware of the substantial risks of taking CELEBREX but failed to fully disclose to the public.   As such, Defendant put the health, safety, and security of millions of people and families at risk of life and, in some cases, death.

14. Defendant failed to meet the applicable standards of care, which were intended for the benefit of individual consumers such as the Plaintiff, making the Defendant liable for the Plaintiff's injuries and for the pain and suffering Defendant has caused the Plaintiff and his children.

15. Prior to his stroke, Plaintiff presented no risk factors for stroke and was in excellent health. Immediately after his stroke, Plaintiff was subjected to numerous hospital stays, a battery tests including, but not limited to, painful invasive tests, exams,

MRIs, brain scans, spinal taps, cat scans – all reporting and confirming that Plaintiff presented no risk factors for stroke or heart attack. Plaintiff is not a smoker, and, prior to his stroke, lived a wholesome life free of health issues, inclusive of regular exercise, good nutrition. In fact, it was concluded by Georgetown Hospital, in Washington, DC, that Plaintiff's stroke was "secondary" only to his ingestion of CELEBREX at dosage levels at and above 400mg per day. At the time of his stroke in May, 2005, Plaintiff was 39 years old and was an energetic young man carrying on a normal life free of drugs, alcohol, and undue stress. At the time of his stroke, Plaintiff was an active father of a four and two year old normal little boys. At the time of his stroke, Plaintiff was a highly respected and sought-after patent attorney who represented clients from all over the world and who was often asked to speak publicly on many topics including, but not limited to, topics related to legal ethics before sections of the American Bar Association; today, the Plaintiff has been instructed by his doctors to "take it easy," to reduce workload significantly, and to work significantly less, if required to work at all, and to plan and implement an easier, post-stroke life free of the demands and stresses associated with being a practicing patent attorney and litigator. Plaintiff's life has been permanently affected by ingesting CELEBREX and Plaintiff continues to be treated for his stroke-related permanent injuries and will be so treated for the rest of his life. Plaintiff will for the rest of his life have to cope with permanent injuries he sustained as a direct and proximate result of taking CELEBREX. Such a post-stroke life includes, but is not limited to, the taking of numerous prescription medications daily, general, chronic fatigue, facial and muscular deficits, decreased sex-drive, decreased motor skills throughout parts of his body, etc.

16.    Furthermore, Plaintiff's children have also suffered from the egregious conduct on the part of the Defendant in producing, fraudulently marketing, and having the Plaintiff ingest CELEBREX.  The boys, Harry and Charlie, have often had to be without the benefit of having their father fully available to them for normal childhood activities including, but not limited to, playing games and sports in the sun of a hot summer day, etc.  The boys often have to hear that "Dad needs to take a rest" when before his Stroke, Plaintiff was always active, energetic, and able to perform all routine and normal parent-child activities.  Defendant's wrongful conduct has had a significant impact on two little boys who can tell a horror story of witnessing their father unable to speak, unable to walk properly, unable to feel across major areas of his body, and very often forced to terrible fatigue by normal day-to-day activities.  Defendant's horrible acts to mislead the public about CELEBREX put the Plaintiff and his children at great risk – all for greater profits and without any care for the people who wrongly rely on Defendant to make the world a better place in which people can get better and feel better from what ever ails them.  It is unfortunate that a four year old little boy, Charlie, can tell a story about almost losing his Daddy to a stroke – a stroke caused solely and completely at the hands of a greedy Defendant.

17.  In a related case, it has been recently determined that based on reliable scientific evidence that CELEBREX did and continues to present greater than acceptable risks of causing heart attacks and strokes and, in particular, at the dosage levels the Plaintiff was prescribed and which he in fact ingested.  See Bextra & Celebrex Litigation, Case No. M:05-CV-01699-CRB (Memorandum and Order of Judge Breyer dated November 19, 2007).  Exhibit 3.

## COUNT I: NEGLIGENCE

18. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein and further alleges:

19. Defendant Pfizer and its representatives were merchants or sellers of CELEBREX.

20. Despite the fact that Defendant knew, or should have known that CELEBREX could cause unreasonable injurious results and/or death to Plaintiff, the Defendant continued to market, distribute, and sell CELEBREX to the public and throughout this Judicial District.

21. Defendant knew, or should have known that consumers, such as Plaintiff, would foreseeably suffer injuries and/or death as a result of Defendant failure to exercise ordinary and reasonable care. Moreover, after Defendant became aware of the serious risks of ingesting CELEBREX (before Plaintiff had a stroke caused by CELEBREX), Defendant owed a legal duty to Plaintiff, and the general public, to disclose that knowledge. Defendant's breach of its duty to disclose this information was a proximate cause of the injuries to the Plaintiff.

22. As a direct and proximate result of the negligence and breach of Defendant Pfizer's duties owed to Plaintiff, Plaintiff sustained and suffered and continues to suffer the effects a stroke. Defendant owed a duty to Plaintiff  (and to his children) to use reasonable care in its actions. Defendant's failure to use reasonable care proximately caused Plaintiff's injuries related to his stroke which have also caused the Plaintiff to incur significant costs, including medical expenses, lost wages, physical and mental pain, suffering and anguish.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant for actual, general, and compensatory damages in connection with this Count I in the amount of $11,000,000.00.

## COUNT II: STRICT PRODUCT LIABILITY

23. The Plaintiff adopts and re-alleges all paragraphs above as if fully set forth herein.

24. CELEBREX, as designed, manufactured, sold and/or supplied by Defendant Pfizer, was placed into the stream of commerce by Defendant in a defective and unreasonably dangerous condition taking into consideration the utility of the product and the risks involved with the drug's use.

25. Further, CELEBREX, as designed, manufactured, distributed, sold and/or supplied by Defendant, was (and continues to be) defective in connection with the marketing of the same due to inadequate warnings, instructions, and/or labeling.

26. CELEBREX, as designed, manufactured, distributed, marketed, sold and/or supplied was (and continues to be) defective due to inadequate testing.

27. CELEBREX was (and continues to be) defective in design and/or formulation in that, when it left the hands of Defendant and/or its representative, agents or assignees, the foreseeable risks of serious harm posed by this drug far exceeded its alleged benefits. The foreseeable risks of serious harm were so that Plaintiff and the general public, having known of such foreseeable risks and alleged benefits, would ***NOT*** have ingested CELEBREX.

28. CELEBREX was also defective (and continues to be) due to inadequate warnings and misrepresentations to healthcare professionals. Defendant knew that had

8

healthcare professionals been adequately warned of the serious risks of injury to their patients, healthcare professionals would *NOT* have prescribed and/or given CELEBREX to patients including, but not limited to, the Plaintiff.

29. CELEBREX was (and continues to be) defective due to inadequate testing both before and after Defendant became aware of the very serious risks of ingesting the drug.

30. As the producing and direct cause and legal result of the design defect and/or the marketing defect due to the Defendant's failure to warn consumers, as well as the defective condition of the drug as manufactured and supplied by Defendant and its representatives, Plaintiff suffered injuries and damages as set forth above.

*WHEREFORE*, the Plaintiff prays for judgment against Defendant for actual, general, and compensatory damages in connection with this Count II in the amount of $11,000,000.00.

## COUNT III: FRAUD – DECEIT BY CONCEALMENT

31. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein and further alleges:

32. Defendant Pfizer fraudulently represented to the general public, as well as healthcare professionals, that CELEBREX was a safe and effective drug. Defendant made this representation while knowing full well that, if healthcare professionals and consumers knew of the very serious risks associated with the ingestion of CELEBREX, they would not have prescribed and ingest this drug, respectively. Defendant knew its representations to be false and in so knowing concealed the truth from the public, and Plaintiff relied on Defendant's false representations in ingesting CELEBREX. These

fraudulent representations by Defendant Pfizer were the proximate cause of Plaintiff's injuries as set forth above.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant for actual, general, and compensatory damages in connection with this Count III in the amount of $11,000,000.00 and $160,000,000.00 in punitive damages.

## COUNT IV: NEGLIGENT MISREPRESENTATIONS

33. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein and further alleges:

34. Defendant Pfizer represented and marketed CELEBREX as being safe and effective. After Defendant became aware of the very serious risks of ingesting CELEBREX, however, Defendant failed to communicate to Plaintiff and/or the general public, that the ingestion of CELEBREX could cause a person to suffer a stroke, or that CELEBREX could cause a heart attack to the person ingesting the drug.

35. Therefore, Plaintiff brings this cause of action against Defendant under the theory of negligent misrepresentation for the following reasons:

    a) The Plaintiff incorporates all facts and allegations previously stated in this Complaint;
    b) Defendant Pfizer failed to warn Plaintiff, and other consumers, of the defective condition of CELEBREX, as manufactured and/or supplied by Defendant;
    c) Defendant Pfizer, individually, and through its agents, representatives, distributors and/or employees, negligently misrepresented material facts about CELEBREX in that they made such misrepresentations when they knew or reasonably should have known of the falsity of such misrepresentations. Alternatively, Defendant Pfizer made such misrepresentations, without exercising due and reasonable care to ascertain the accuracy of these representations;
    d) The above misrepresentations were made to Plaintiff, as well as the general public;
    e) Plaintiff and his healthcare providers justifiably relied on Defendant's

misrepresentations; and

f) Consequently, ingestion of CELEBREX was to Plaintiff's permanent detriment.

36. As a direct and proximate result of the fraudulent acts and omissions, and misrepresentation of Defendant Pfizer, Plaintiff suffered significant and ongoing injuries and damages as set forth above.

*WHEREFORE*, the Plaintiff prays for judgment against Defendant for actual, general, and compensatory damages in connection with this Count V in the amount of $11,000,000.00.

## COUNT V: EXPRESSED WARRANTY FOR GOODS

37. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein and further alleges:

38. Defendant breached its express warranty of goods. Defendant Pfizer was a merchant and/or seller of the CELEBREX drug. Defendant sold this drug to consumers for the ordinary purpose for which such drugs are used by consumers. Defendant Pfizer owed a legal duty to Plaintiff and the public in general, to disclose its knowledge of the very serious risks of ingesting CELEBREX as marketed. As a direct and proximate result of Defendant's breach of warranties, Plaintiff was injured and suffered special, general and compensatory damages as set forth above.

*WHEREFORE*, the Plaintiff prays for judgment against Defendant for actual, general, and compensatory damages in connection with this Count II in the amount of $11,000,000.00.

11

## COUNT VI: BREACHES OF IMPLIED WARRANTIES

### A. WARRANTY OF MERCHANTABILITY

39. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein and further alleges:

40. Defendant breached its implied warranty of merchantability. Defendant was a merchant and/or seller of CELEBREX. Defendant sold this drug to Plaintiff, and other consumers, for the ordinary purpose for which such drug is used by consumers. CELEBREX was defective, or unmerchantable, i.e., not fit for the ordinary purposes for which such drugs were and are used (e.g., pain management and control, etc.).

41. As a direct and proximate result of the defect or defects of the drug, Plaintiff suffered significant and ongoing injury and damages as set forth above.

### B. WARRANTY OF FITNESS

42. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein, and further alleges:

43. Defendant breached its implied warranty of fitness. Defendant sold CELEBREX, and, at the time of the sale of this drug, Defendant knew or had reason to know of a particular purpose for which the drug was to be used. At the time of the sale of the drug to Plaintiff, Defendant Pfizer knew, or had reason to know, that Plaintiff was relying on the skill and judgment of Defendant to select or furnish a suitable product for the intended purpose. At the time of sale of the drug to Plaintiff, Defendant Pfizer exercised its skill and judgment in the selection of this drug as safe and effective, and Plaintiff relied thereon. CELEBREX was not reasonably fit and/or suitable for the use for which it was selected.

44. Failure of Defendant to select and sell a product which, was reasonably safe for its intended use, proximately caused Plaintiff's injuries as set forth above.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant for actual, general, and compensatory damages in connection with this Count VI in the amount of $11,000,000.00.

## COUNT VII: UNJUST ENRICHMENT

45. The Plaintiff incorporates by reference all other paragraphs of this Complaint as fully set forth herein and further alleges:

46. Defendant Pfizer accepted payment from Plaintiff for his purchase of CELEBREX.

47. Plaintiff did not receive a safe and effective drug for which Plaintiff paid.

48. It would not be equitable for Defendant Pfizer to retain this money because Plaintiff did not, in fact, receive a safe and efficacious drug.

**WHEREFORE**, the Plaintiff, Erik B. Cherdak, prays for judgment against Defendant, Pfizer Inc., for actual, general, and compensatory damages in the amount of Plaintiff's prescriptions for CELEBREX.

## ADDITIONAL PRAYERS FOR RELIEF

49.    In addition to the individual prayers for relief stated above in Counts I-VII hereof, the Plaintiff prays that this Honorable Court grant the following additional relief:

50.    The Plaintiff prays that this Honorable Court issue an Order admonishing Defendant for its egregious acts in marketing and selling a drug as dangerous as CELEBREX.  So many people have been so negatively affected and injured by Defendant's greed and wrongful acts that this Honorable Court must send a clear and

concise message to drug companies that "profits **must come second** to the safety and health of the people that place their precious trust in such drug companies to make them better."

51.     The Plaintiff prays that this Honorable Court   issue a Permanent Injunction against Defendant prohibiting Defendant from marketing and selling CELEBREX in the United States and prohibiting Defendant and all third parties associated with the manufacture and sale of CELEBREX in concert with Defendant from exporting CELEBREX to places around the globe where people are innocently taking CELEBREX at their peril.

52.     The Plaintiff prays that this Honorable Court deny any motions to transfer and/or consolidate this case into any other litigations pending in this Country.  Such a transfer and or consolidation would be unfair to the Plaintiff and would cause the Plaintiff to possibly litigate this case in a jurisdiction in which Plaintiff has no minimum contacts.

53.     The Plaintiff prays that this Honorable Court act within its powers to punish Defendant Pfizer and its operating units by awarding to the Plaintiff all due and fair punitive damages so that the crystal clear message that "health and safety must come second to profits" in this country.

54.     And, finally, Plaintiff prays that this Honorable Court grant all other relief that it deems just and appropriate.

Respectfully submitted,

Erik B. Cherdak, *Plaintiff Pro Se*

## REQUEST FOR TRIAL BY JURY

The Plaintiff hereby requests TRIAL BY JURY on all issues so trialable.

14



# Georgetown University Hospital

*MedStar Health*

Department of Neurology
1st Floor Bles

December 20, 2005

Re: Eric Cherdak

To Whom It May Concern:

Mr. Eric Cherdak is under my care in the Department of Neurology at Georgetown University Hospital. Mr. Cherdak developed sensory loss in May of 2005, with a subsequent MRI of the brain revealing an infarction of the left frontal lobe. An exhaustive workup failed to reveal any hematologic or cardiogenic source for the infarction, which appears to be thrombotic in origin. His only risk factor was a history of COX-2 inhibitor use (Celebrex) prior to the onset of his symptoms. Of note is that Mr. Cherdak had no previous medical history that would have predisposed him to a cerebral infarction of either thrombotic or embolic origin. It is my opinion, to a reasonable degree of medical certainty, that Mr. Cherdak's cerebral infarction was secondary to the Celebrex that he was taking at that time. If you have any questions, feel free to contact me at 202-444-2410.

Sincerely,

Carlo Tornatore, M.D.
Associate Professor of Neurology

3800 Reservoir Road, NW, Washington, DC 20007-2113



Start With

**Day 1**
- Take this 400-mg capsule first.

- Take this 200-mg capsule if needed.

# CELEBREX
CELECOXIB CAPSULES

## for Acute Pain

- This starter Pain Pack contains enough medicine for day 1

- You will need to fill your prescription for CELEBREX 200-mg capsules

- CELEBREX can be taken with or without food

- Be sure to follow your doctor's instructions about how to take your medicine

**For patient information, please call:**
**1-877-292-6921**

or visit our Web site at:
**www.celebrex.com**

1

2

3

4

5

6

7

8        UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10

| 11 | IN RE: BEXTRA AND CELEBREX | CASE NO. M:05-CV-01699-CRB |
| 12 | MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | MDL No. 1699 |
| 13 | | |
| 14 | This Order Relates to: | **MEMORANDUM AND ORDER RE: MOTIONS TO EXCLUDE EXPERT** |
| 15 | ALL CASES | **TESTIMONY** |
| 16 | | |

17          In this Multi-District Litigation ("MDL") proceeding, over 3000 plaintiffs allege

18    that they or their loved ones suffered a heart attack, stroke or other adverse cardiovascular

19    event as a result of taking Celebrex, a pain medication manufactured by defendant Pfizer,

20    Inc. ("Pfizer"). Pfizer has moved to exclude any expert testimony to the effect that

21    Celebrex is capable of causing a heart attack or stroke when ingested at 200 milligrams a

22    day or 400 milligrams a day. Plaintiffs have also moved to exclude certain expert

23    testimony offered by Pfizer. The Court held three days of hearings which included direct

24    and cross examination of certain experts. After carefully considering the parties'

25    memoranda and evidence, and the testimony offered at the hearing, the Court concludes

26    that plaintiffs have not presented scientifically reliable evidence that Celebrex causes

27    heart attacks or strokes when ingested at the 200 milligram a day dose. In all other

28    respects the parties' motions are denied.

**BACKGROUND**

1
2      Non-steroidal anti-inflammatory drugs ("NSAIDs") have been widely used for pain
3  relief for several years.  NSAIDs, however, have certain side effects, including
4  gastrointestinal toxicity which results in thousands of deaths every year.  The
5  pharmaceutical company Merck & Co., Inc. ("Merck") developed Vioxx, and Pfizer (or,
6  more precisely, its predecessors) developed Celebrex and Bextra, NSAIDs known as
7  COX-2 inhibitors, with the expectation that they would have fewer gastrointestinal side
8  effects than traditional NSAIDs.  The Food and Drug Administration ("FDA") approved
9  Celebrex for adult arthritis in 1998, Vioxx in 1999, and Bextra in late 2001.  The
10 recommended dose of Celebrex was and is 200 milligrams a day ("mg/d") for arthritis and
11 400 mg/d for rheumatoid arthritis.
12      In 2000 the results of a long-term randomized study of Celebrex known as CLASS
13 ("Celecoxib Long-Term Arthritis Safety Study") were published.  The study was designed
14 to evaluate the gastrointestinal side effects of taking Celebrex at 800 mg/d.  Based on
15 investigator reported cardiovascular events, the study showed no increased risk of heart
16 attack or stroke by taking Celebrex over diclofenac or ibuprofen.  Around the same time, a
17 similar study of Vioxx, known as VIGOR, showed a four-fold increase in cardiovascular
18 ("cv") risk for patients taking Vioxx versus Aleve (naproxen).  The FDA subsequently
19 revised the labels of Celebrex and Vioxx to reflect the cv risk results of these studies.
20      Another Vioxx randomized clinical study, known as APPROVe, was published in
21 2004.  This study demonstrated a two-fold increased risk of cv adverse events for patients
22 taking Vioxx versus a placebo.  This study contributed to Merck's voluntary removal of
23 Vioxx from the market on September 30, 2004.
24      The preliminary results of APC, a randomized, placebo-controlled study of
25 Celebrex at 200 mg twice daily (400 mg/d) and 400 mg twice daily (800 mg/d) to evaluate
26 whether Celebrex prevents the development of colon polyps, became available in late
27 2004.  APC showed dose-related increased cv risk for patients taking Celebrex compared
28 to placebo: more than doubling the risk for 200 mg twice daily and tripling the risk for

1   400 mg twice daily.  The APC steering committee discontinued the study in December

2   2004 because of these preliminary results.

3          In February 2005 the FDA convened an Advisory Committee to review the data on

4   cv risk and NSAIDs, including COX-2 inhibitors.  The Committee concluded that all

5   COX-2 inhibitors increase cv risk versus placebo, but it did not make any findings as to

6   what dose is required to increase the risk.  It also concluded that the data was insufficient

7   to determine if traditional NSAIDs also increase cv risk.  With respect to Celebrex, the

8   FDA found that APC is the "strongest data in support of an increased risk of serious

9   adverse CV events."  FDA Decision Memorandum, April 6, 2005, at 4, Declaration of

10  Loren Brown ("Brown Decl.") Exh. 16.  The FDA also noted that APC's results had not

11  been replicated by preliminary data from two other randomized controlled clinical studies:

12  (1) PreSAP, a colon polyp prevention trial of Celebrex at 400 mg/d; and (2) ADAPT, an

13  Alzheimer's trial of Celebrex at 200 twice daily (400 mg/d).  Both studies showed no

14  increased cv risk for Celebrex versus placebo.

15         The FDA subsequently asked Pfizer to remove Bextra from the market, which

16  Pfizer did in April 2005.  The FDA also determined that the benefits of Celebrex outweigh

17  its risks and therefore it allowed Celebrex to remain on the market.  Celebrex is the only

18  COX-2 inhibitor currently on the market.

19         The FDA also directed all NSAIDs, including Celebrex, to include a black box

20  warning on their labels.  The black box warns of cv risk as follows:

21      **Cardiovascular Risk**
           • CELEBREX may cause an increased risk of serious cardiovascular
22           thrombotic events, myocardial infarction, and stroke, which can be fatal.
             All NSAIDs may have a similar risk.  This risk may increase with duration
23           of use.  Patients with cardiovascular disease or risk factors for
             cardiovascular disease may be at greater risk . . . .
24

25  Celebrex 2007 Label, Brown Decl. Exh. 3.

26         As a result of these developments, thousands of patients and patient representatives

27  filed lawsuits against Merck and Pfizer alleging that the patient had suffered a serious

28
                                        -3-

1    cardiovascular injury, such as a heart attack or stroke, due to their ingestion of Vioxx,

2    and/or Celebrex and/or Bextra.  All of the federal court claims against Merck were

3    consolidated in a MDL action in New Orleans.  All of the federal court claims against

4    Pfizer were consolidated into this MDL proceeding.

5                            **THE DAUBERT MOTIONS**

6            Pursuant to Federal Rule of Evidence 702, Pfizer moves to exclude plaintiffs'

7    experts from offering the following six opinions:

8         1.    That 200 mg/d of Celebrex causes heart attacks and strokes;

9         2.    That 400 mg/d of Celebrex causes heart attacks and strokes;

10        3.    That Celebrex causes heart attacks or strokes more than three days after a

11              patient stops taking it;

12        4.    That Celebrex causes strokes; and;

13        5.    That Celebrex causes heart attacks or stokes at durations of less than 33

14              months of continuous daily use.

15   Pfizer also asks the Court to exclude any expert opinion that Celebrex caused any

16   individual plaintiff's heart or stroke absent epidemiology evidence that demonstrates a

17   relative risk greater than 2.0, that is, that Celebrex doubles the risk.  Plaintiffs have moved

18   to exclude certain expert testimony offered by Pfizer; specifically, they seek to exclude

19   admission of the meta-analyses performed by plaintiffs' experts.

20           In connection with these motions, the parties submitted direct written testimony of

21   their respective experts as well as legal memoranda.  The Court then held three days of

22   hearings, which were conducted jointly with the New York Justice presiding over the New

23   York State Celebrex and Bextra cases.  Plaintiffs' experts Dr. Neil Doherty, Dr. Joel

24   Bennett, Dr. Nicholas Jewell and Dr. Maryilyn Rymer testified on direct and cross-

25   examination, along with defendant's expert Dr. Milton Packer. The parties also submitted

26   post-hearing memoranda.  The motions are now ripe for decision.

27   //

28   //

1

## LEGAL STANDARD

2

### A.    Admissibility of Expert Testimony

3    When evaluating the admissibility of expert testimony, the trial judge "must engage

4    in a difficult, two-part analysis." Daubert v. Merrill Dow Pharmaceuticals, Inc., 43 F.3d

5    1311, 1315 (9th Cir. 1995) (Daubert II).   First, the court must "determine nothing less

6    than whether the experts' testimony reflects 'scientific knowledge,' whether their findings

7    are 'derived by the scientific method,' and whether their work product amounts to 'good

8    science.'" Id. (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-

9    90, 593 (1993)); see also In Re Silicone Gel Breast Impl. Prod. Liab. Lit., 318 F.Supp.2d

10    879, 890 (C.D. Cal. 2004) ("'[T]he trial judge in all cases of proffered expert testimony

11    must find that it is properly grounded, well-reasoned, and not speculative before it can be

12    admitted.'") (quoting Fed. R. Evid. 702 Advisory Committee's Notes).   The trial judge's

13    obligation "is to make certain that an expert . . . employs in the courtroom the same level

14    of intellectual rigor that characterizes the practice of an expert in the relevant field."

15    Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

16    Many factors may be relevant to the reliability inquiry, including: (1) whether the

17    proffered theory or technique has been tested, (2) whether the theory or technique has

18    been subjected to peer review and publication, (3) the known or potential rate of error of

19    the technique or theory when applied, and (4) the "general acceptance" of the theory or

20    technique in the scientific community.   Daubert, 509 U.S. at 593-94.

21

22

23

24

25

26

27
> [C]ourts have also found the following factors relevant in assessing the reliability of expert testimony: (1) whether the expert is proposing to testify about matters growing directly out of independent research he or she has conducted or whether the opinion was developed expressly for purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered.

28

1   In Re Silicone Gel Breast Impl. Prod. Liab. Lit., 318 F.Supp.2d at 890 (citing

2   Fed.R.Evid. 702 Advisory Committee's Notes).

3        In addition to determining reliability, the court "must ensure that the proposed

4   expert testimony is 'relevant to the task at hand,' i.e., that it logically advances a material

5   aspect of the proposing party's case." Daubert II, 43 F.3d at 1315 (quoting Daubert, 509

6   U.S. at 597). This is known as the "fit" requirement. Id. Here, the pertinent fit inquiry is

7   "causation." The parties' motions address expert testimony on the causation inquiry.

8   **B.    Causation**

9        Causation in toxic tort or pharmaceutical personal injury cases "is typically

10  discussed in terms of generic and specific causation." In Re Hanford Nuclear Reservation

11  Lit., 292 F.3d 1124, 1133 (9th Cir. 2002). General or generic causation means "whether

12  the substance at issue had the capacity to cause the harm alleged." Id. In Hanford, for

13  example, the Ninth Circuit explained that the general causation inquiry was "whether

14  exposure to a substance for which a defendant is responsible, such as radiation at the level

15  of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in

16  the general population." Id.

17       To ultimately prevail in such a lawsuit, however, a plaintiff must show both

18  general and "individual" or "specific" causation. Id. Specific causation refers to whether

19  a particular individual suffers from a particular ailment as a result of exposure to a

20  substance. Id. That is, that the challenged conduct, here, the taking of Celebrex at a

21  certain dose for a particular amount of time, was "the cause-in-fact" of the particular

22  plaintiff's injury. Id.

23       The parties' motions involve the use of epidemiology to prove causation. "The

24  field of epidemiology addresses the incidence, distribution and etiology (causation) of

25  disease in human populations by comparing individuals exposed to a particular agent to

26  unexposed individuals to determine whether exposure increases the risk of disease." In

27  Re Silicone Gel Breast Implant Prod. Liab. Lit., 318 F.Supp.2d at 892. Scientists use

28  "relative risk" to identify an association between, for example, the ingestion of a drug and

-6-

1   a disease.

2       For example, if a study found that 10 out of 1000 women with breast implants were
3       diagnosed with breast cancer and 5 out of 1000 women without implants (the
        "control" group) were diagnosed with breast cancer, the relative risk of implants is
4       2.0, or twice as great as the risk of breast cancer without implants. This is so,
        because the proportion of women in the implant group with breast cancer is 0.1
5       (10/1000) and the proportion of women in the non-implant group with breast
6       cancer is 0.05 (5/1000). And 0.1 divided by 0.05 is 2.0.

7   Id. A relative risk of 1.0 suggests that there is no association between the product and the

8   disease, that is, the same numbers of people using the product are diagnosed with the

9   disease as those not using the product. Similarly, a relative risk of less than 1.0 suggests

10  that the product is actually "protective" of the disease: fewer people using the product

11  contract the disease than those not taking the product. Id. at n.5.

12      In general, epidemiology studies are probative of general causation: a relative risk

13  greater than 1.0 means the product has the capacity to cause the disease. "Where the

14  study properly accounts for potential confounding factors and concludes that exposure to

15  the agent is what increases the probability of contracting the disease, the study has

16  demonstrated *general* causation–that exposure to the agent is capable of causing [the

17  illness at issue] in the general population." Id. at 893 (internal quotation marks and

18  citation omitted).

19      Such studies can also be probative of specific causation, but only if the relative risk

20  is greater than 2.0, that is, the product more than doubles the risk of getting the disease.

21      When the relative risk is 2.0, the alleged cause is responsible for an equal
22      number of cases of the disease as all other background causes present in the
        control group. Thus, a relative risk of 2.0 implies a 50% probability that the
23      agent at issue was responsible for a particular individual's disease. This
24      means that a relative risk that is greater than 2.0 permits the conclusion that
        the agent was more likely than not responsible for a particular individual's
25      disease.

26  Id. at 893. The issue on these motions, however, is not specific causation; there is

27  no particular plaintiff before the Court. Rather, the primary issue is whether the

28  Court should permit plaintiffs' experts to testify that Celebrex is capable of causing

1    heart attacks or strokes at certain doses.

2                    **EPIDEMIOLOGY STUDIES AND TERMS**

3            Before discussing the parties' motions, it is important to identify the different

4    epidemiology studies relied upon by the experts. There are generally three types of

5    clinical epidemiology studies at issue on the parties' motions: (1) randomized controlled

6    clinical trials, (2) observational studies, and (3) meta-analyses.

7            The "gold standard" for determining whether a drug is related to the risk of

8    developing an adverse health outcome is a "randomized clinical trial" in which the

9    subjects are randomly assigned to one of two groups: one group exposed to the drug of

10   interest and the other not exposed. After a period of time the study participants in both

11   groups are evaluated for an adverse health outcome. Federal Judicial Center, Reference

12   Manual on Scientific Evidence 338 (2d ed. 2000). "Randomization minimizes the

13   likelihood that there are differences in relevant characteristics between those exposed to

14   the agent and those not exposed," such as smoking, obesity, aspirin use and so on that

15   could account for any difference in outcomes between the two groups. Id.

16           An "observational study" evaluates causation by comparing the risk of disease

17   between patients exposed to a given substance and patients who were not exposed. The

18   study may be prospective, identifying patients and then following them for a period of

19   time, or restrospective, identifying patients and then performing a medical chart review to

20   determine what happened during the period they did or did not take the drug. The

21   downside to observational studies is that because the investigators do not control who

22   participates in the study, it is more difficult to control for confounding factors such as

23   smoking, obesity and the like. The investigator attempts to address the possible role of

24   confounding factors "by considering them in the design of the study and in the analysis

25   and interpretation of the study results." Id. at 339.

26           There are two types of observational studies: a cohort study and a case control

27   study. A cohort study identifies patients who are taking the drug (exposed) and follows

28   them for a certain amount of time to determine if they have the alleged bad outcome, here,

                                            -8-

1      such outcome is heart attack or stroke.  The cohort study also identifies people not taking

2      the drug and follows them (unexposed).  The study then compares the rate of the alleged

3      bad outcomes in group one with the rate in group two to compute the "relative risk."  Id.

4      at 339-40.

5            A case control study identifies persons who had a bad outcome (the cases), for

6      example,  patients in the United Kingdom database that had a heart attack within the last

7      three years, and reviews their medical records to determine how many of those persons

8      were taking the studied drug around the time of their heart attack.  The study then

9      identifies an equal number of people who did not have a heart attack (the controls) and

10    determines how many of them were taking the drug.  Id.  From those figures an "odds

11    ratio" is computed.  For example, if the percentage of people taking Celebrex in both

12    groups is the same, the odds ratio is 1.0; that is, taking Celebrex did not increase the risk

13    of heart attack.

14           Sometimes randomized controlled studies and observational studies of the same

15    drug will have conflicting results; some will show a statistically significant association

16    while others will not.  A meta-analysis pools the results of various studies to arrive at a

17    single figure to represent the totality of the studies reviewed.  "In a meta-analysis, studies

18    are given different weights in proportion to the sizes of their study populations and other

19    characteristics."  Id. at 380.  Meta-analysis has the advantage of pooling more data so that

20    the results are less likely to be misleading solely due to chance.  On the other hand, one

21    problem with meta-analysis, particularly in meta-analysis of observational studies, is that

22    the pooled studies often use disparate methodologies.

23           When reviewing the results of a study, whether it is a randomized clinical trial,

24    observational trial, or a meta-analysis of such trials, it is important to consider the

25    confidence interval.  The confidence interval is, in simple terms, the "margin of error."

26    So, for example, if a given study showed a relative risk of 1.40 (a 40 percent increased

27    risk of adverse events), but the 95 percent confidence interval is .8 to 1.9, we would say

28    that we are 95 percent confident that the true value, that is, the actual relative risk, is

1  between .8 and 1.9. Because the confidence interval includes results which do not show

2  any increased risk, and indeed, show a decreased risk, that is, it includes values less than

3  1.0, we would say the study does not demonstrate a "statistically significant" increased

4  risk of an adverse outcome. Confidence intervals are calculated, in part, based on the

5  number of people and events included in the study. "The larger the sample size in a study

6  (all other things being equal), the narrower the confidence boundaries will be (indicating

7  greater statistical stability), thereby reflecting the decreased likelihood that the association

8  found in the study would occur if the true association is 1.0 [no increased or decreased

9  risk]." Id. at 361.

10         With these terms in mind, the Court now turns to the parties' motions.

11                                    **DISCUSSION**

12  **I.    Pfizer's Motion**

13         A threshold question raised by Pfizer's motion is whether a particular dose of

14  Celebrex is relevant to the general causation inquiry. Pfizer seeks to exclude any opinion

15  that Celebrex is capable of causing heart attacks and strokes at 200 mg/d as well as any

16  opinion that Celebrex is capable of causing heart attacks and strokes at 400 mg/d. It does

17  not move to exclude expert testimony that Celebrex is capable of causing heart attacks and

18  strokes when a patient ingests 800 mg/d, at least when taken over many months. Thus,

19  Pfizer's motion assumes that Celebrex at different doses can have different cardiovascular

20  effects.

21         The Court finds that dose matters. All of plaintiffs' experts, with perhaps a single

22  exception, agree that there is a dose effect with Celebrex; that is, that it is more toxic, and

23  is therefore more likely to cause an adverse side effect, when taken at greater doses. See

24  Reference Manual on Scientific Evidence at 403 ("There are three central tenets of

25  toxicology. First, 'the dose makes the poison'; this implies that all chemical agents are

26  intrinsically hazardous--whether they cause harm is only a question of dose. Even water,

27  if consumed in large quantities, can be toxic."); see also Mitchell v. Gencorp, 165 F.3d

28  778, 781 (10th Cir. 1999) (noting that to prevail in a toxic tort case a "a plaintiff must

1  demonstrate 'the levels of exposure that are hazardous to human beings generally as well

2  as the plaintiff's actual level of exposure to the defendant's toxic substance before he or

3  she may recover") (internal quotation marks and citation omitted); Allen v. Penn. Eng'g

4  Corp., 102 F.3d 194, 199 (5th Cir. 1996) (explaining that in toxic tort cases, "[s]cientific

5  knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff

6  was exposed to such quantities are minimal facts necessary to sustain the plaintiff's

7  burden"); see also Hanford Nuclear Reservation Lit., 292 F.3d at 1133 (explaining that

8  the general causation inquiry is whether exposure to the challenged substance "*at the level*

9  *of exposure alleged by the plaintiffs*" is capable of causing the alleged injuries")

10 (emphasis added). As plaintiffs' cardiology expert, Dr. Neil Doherty, testified: it is a

11 "fundamental principal of medicine" and "medical causality" that the risk of adverse

12 cardiovascular events with Celebrex is dose-related. Transcript of October 10, 2007

13 Hearing ("Oct. 10 TR") at 328. Thus, the Court must analyze plaintiffs' experts' opinions

14 as to causation at 200 mg/d separate from their opinions as to 400 mg/d.

15     **A.    200 mg/d**

16         Celebrex at 200 mg/d and the risk of adverse cv events has not been studied in

17 published, large, long-term randomized controlled trials. Nonetheless, included in the

18 record are approximately 30 unpublished randomized controlled trials, albeit of short

19 duration and small size. These studies do not demonstrate any association between

20 Celebrex and adverse cv outcomes. A meta-analysis of all available published and

21 unpublished randomized clinical trials of all COX-2 inhibitors as well as traditional

22 NSAIDs found that while COX-2 inhibitors as a whole are associated with a moderate

23 increase in the risk of adverse cv events, no such association is found with the available

24 data for Celebrex at 200 mg/d or less. [1]

25         The record also includes observational studies with Celebrex data, mostly at 200

26

27 [1] Patricia Kearney, et al., Do selective cycol-oxygenase-2 inhibitors and traditional non-steroidal ant-inflammatory drugs increase the risk of atherothrombosis? Meta-analysis of randomized trials, British Medical Journal 2006, June 3; 332(7553): 1302-8.

28

1  mg/d.  These observational studies together include more than 8,000 adverse cv events,

2  and all of the studies with the most events demonstrate no statistically significant

3  association between Celebrex at 200 mg/d and adverse cv events.  A meta-analysis

4  performed by an independent researcher unaffiliated with Pfizer ("McGettigan")

5  concluded that while Vioxx does increase the risk of adverse cv events, "[i]n doses of

6  around 200 mg/d, [Celebrex] was not associated with an increased risk . . . ."[2] Another

7  meta-analysis of eight observational studies showed no increased risk from Celebrex 200

8  mg/d compared to patients taking no medication.[3]

9         In sum, there are no randomized controlled trials or meta-analyses of such trials or

10  meta-analyses of observational studies that find an association between Celebrex 200

11  mg/d and a risk of heart attack or stroke.  And most observational studies, indeed, the

12  observational studies that include 97 percent of the reported adverse cv events, also find

13  no statistically significant association.  It is thus unsurprising that most of plaintiffs'

14  experts agree that the available evidence at 200 mg/d is inadequate to prove causation.

15  See Deposition Testimony of Dr. Joel Bennett at p. 537, Brown Reply Decl. Exh. 108 ("I

16  think that if you look at all the evidence, I think at 200 milligrams it's hard to make a case

17  that Celebrex has toxicity.  It doesn't mean that, again, that in individual cases it couldn't,

18  it could be lost in the big scheme of things, but, in fact, the data don't suggest that in a

19  large population it increases the risk.");  Deposition Testimony of Dr. Lemue Moye at

20  p. 268,  Brown Reply Decl. Exh. 109 ("[T]here's no study that convincingly demonstrates

21  a signal of cardiovascular events at very low does such as 200 per day.");  Deposition

22  Testimony of Dr. Nicholas Jewell at p. 130, Brown Reply Decl. Exh. 110 (when asked

23  whether there is reliable scientific evidence to establish that 200 mg/d causes heart attacks

24  and strokes he responded that the evidence is not sufficient "to be definitive");  Deposition

25  [2] Patricia McGettigan, et al., Cardiovascular Risk and Inhibition of Cyclooxygenase: A

26  Systematic Review of the Observational Studies of Selective and Nonselective inhibitors of Cyclooxygenase 2, JAMA 2006 Oct 4; 296(13): 633-44.

27  [3] S. Hernandez-Diaz et al., Non-steroidal anti-inflammatory drugs and the risk of acute myocardial infarction, Basic Clin. Pharmacol. Toxicol. 2006 Mar; 98(3):266-274, at 270, 273.

28

1  of Dr. James M. Wright at pp. 83-84, 92, Brown Decl. Reply Exh. 106 (stating that it has

2  not been proven that at 200 mg/d Celebrex increases the risk of heart attack because "we

3  don't have enough information").

4        **1.    Dr. Neil Doherty**

5        Plaintiffs' cardiology expert, Dr. Neil Doherty, nonetheless asserts "to a reasonable

6  degree of medical probability that the 200 mg dose of Celebrex can increase the risk of

7  MI's [heart attacks]."  Written Direct Examination of Dr. Neil F. Doherty III ("Doherty

8  Written Direct") at ¶ 18.  He reaches his opinion by first identifying his conclusion—

9  causation at 200 mg/d—and then cherry-picking observational studies that support his

10  conclusion and rejecting or ignoring the great weight of the evidence that contradicts his

11  conclusion.  Dr. Doherty's opinion does not reflect scientific knowledge, is not derived by

12  the scientific method, and is not "good science;" it is therefore inadmissible.

13        First, Dr. Doherty is not qualified to favor certain observational studies over the

14  great weight of the epidemiologic evidence to give an opinion on causation.  He is a

15  clinical cardiologist who sees patients 95 percent of his physician time.  He does not have

16  any specialized epidemiology training.  He has not published any research since 1992, and

17  his 13 publications are unrelated to the subject matter of these lawsuits.  He has never

18  participated in an observational study of any kind.  He is therefore not qualified to opine

19  that one or two observational studies are correct while all the other studies (the studies

20  that include 97 percent of the adverse cv events) are wrong.  Moreover, he only became

21  interested in Celebrex and cv risk *after* he was retained by plaintiffs in this litigation;

22  indeed, although the issue of COX-2 inhibitors and adverse cv events has been well

23  known since at least 2005, he did not discontinue prescribing Celebrex until after

24  plaintiffs retained him as an expert in this case.  Doherty Written Direct at ¶ 2.  Dr.

25  Doherty's opinion was developed for the purpose of this litigation.  See Daubert II, 43

26  F.3d at 1317 ("One very significant fact to be considered is whether the experts are

27  proposing to testify about matters growing naturally and directly out of research they have

28  conducted independent of the litigation, or whether they have developed their opinions

1    expressly for purposes of testifying.").

2          Second, apart from his lack of relevant experience and training (or because of it),

3    the foundation of his opinion--wholly rejecting the McGettigan meta-analysis and the

4    other observational studies that do not support his opinion--is not a scientifically valid

5    methodology.  For example, while he justifies his wholesale rejection of McGettigan on

6    the blanket ground that meta-analysis is inappropriate for observational studies, plaintiffs'

7    other experts rely on such studies; indeed, Dr. Bennett testified that McGettigan is a "good

8    study."  Dr. Bennett Depo. at p. 187-88, Brown Reply Decl. Exh. 108.  And the American

9    Heart Association Committee that developed a "Science Advisory" on the use of NSAIDs

10   also relied on McGettigan.  Finally, Dr. Doherty testified that he prefers the Oxford

11   Centre for Evidence Based Medicine ranking of the levels of evidence that a scientist

12   should consider.  Doherty Written Direct at ¶ 21-22.  That ranking identifies systematic

13   review, including meta-analysis, as the highest level for each category of evidence.  Oct.

14   10 TR at 350.

15         Third, Dr. Doherty testified that the "strongest evidence" for his 200 mg/d opinion

16   "is the Andersohn study published in <u>Circulation</u> in 2006."[4]  Doherty Written Direct at

17   ¶ 18.  He attempts to justify his heavy reliance on Andersohn by asserting that it is the

18   "best designed" of all the observational studies. When asked why, however, Dr. Doherty

19   responded only that the study is derived from the United Kingdom database which is

20   among the most complete in the world.  Oct. 10 TR at 309-10.  He also mentioned that

21   Andersohn is a prospective, rather than retrospective study.  <u>Id.</u> at 310.  But many of the

22   other studies he rejects out of hand are also prospective, and he does not cite anything in

23   the medical literature that suggests that it is a valid scientific method to prefer one study

24   over many that have contradictory results simply because the study that supports the

25   expert's conclusion utilized the United Kingdom database.

26   _____

27   [4] Frank Andersohn, et al., <u>Use of First-and Second-Generation Cyclooxygenase-2-Selective Nonsteroidal Anti-inflammatory Drugs and Risk of Acute Amuyocardial Infarction</u>, Circulation, 2006 Apr 25; 113(16): 1950-7.

28

1    Fourth, Dr. Doherty's reliance on Andersohn as "the strongest evidence" of an

2   increased risk at 200 mg/d is undermined by his own testimony that Andersohn's results

3   do not make "biological sense." Oct. 10 TR at 363-64. Andersohn found the increased

4   risk of heart attack was higher at shorter durations of use (less than three months) than at

5   higher durations; indeed, there was no statistically significant association at durations

6   greater than three months, a finding that directly contradicts Dr. Doherty's testimony that

7   the risk of heart attack increases with duration of use. Oct. 10 TR at 359-61. Andersohn

8   also found that the risk of heart attack is statistically significant in patients without cv risk

9   factors, but is not statistically significant in patients with such risk factors. Id. at 364.

10   Again, this finding directly contradicts Dr. Doherty's testimony that the risk of heart

11   attack from Celebrex is greater in patients with heart disease. To conclude that Celebrex

12   200 mg/d causes heart attacks and strokes based on a study that does not make "biological

13   sense" is not sound science.

14    Fifth, Dr. Doherty's opinion is based on his fundamental misunderstanding of

15   Andersohn. Dr. Doherty testified that Andersohn is a cohort study and he "puts a lot more

16   weight" into cohort studies as opposed to case control studies. Oct. 10 TR at 255, 309,

17   350. He repeatedly testified that he relies on Andersohn out of all of the available

18   evidence because it is a good cohort study. See, e.g., id. at 313, 315. When he was

19   confronted with Andersohn's own description of the study, however, Dr. Doherty

20   conceded that Andersohn is not a cohort study, but is instead "a case-control study nested

21   within a cohort study." Id. at 352.

22    Dr. Doherty also insisted that Andersohn used cox proportional hazard analysis, the

23   analysis most commonly used for cohort studies. Oct. 10 TR at 320-21, 355. On cross-

24   examination, however, he could not identify where in the study the authors disclose that

25   they used cox-proportional hazard analysis and Dr. Doherty pointedly did not clarify his

26   testimony on re-direct. The Court has reviewed Andersohn and it does not indicate that

27   the study authors used cox-proportional hazard analysis; rather, they used logistic

28   regression which resulted in an "odds ratio," an analysis consistent with case control

1   studies. Dr. Doherty's fundamental misunderstanding of the study he "relied most

2   strongly on" to support his opinion, Doherty Written Direct at ¶ 31, is perhaps explained

3   by his inability to explain the difference between a cohort study and case control study

4   "off the top of his head," Oct. 10 TR at 348, and his inability to define the cox

5   proportional hazards model or explain logistic regression analysis. Id. In any event, as

6   Andersohn is a case control study, Dr. Doherty's heavy reliance upon it is unreliable in

7   light of his own blanket rejection of all of the case control studies showing no association

8   between Celebrex 200 mg/d and cv risk on the ground that case control studies are not as

9   reliable as cohort studies. Doherty Written Direct at ¶ 37.

10      While Andersohn is the "strongest evidence" supporting Dr. Doherty's opinion, he

11  also cited an additional observational study, Gislason.[5] Gislason, however, had few

12  events and merely evaluated COX-2 inhibitors and the risk of a heart attack in patients

13  who had already had a heart attack. Moreover, the study failed to control for smoking, a

14  well-known risk for heart attack, as well as aspirin use, even though another of plaintiffs'

15  experts, Dr. Maryilyn Rymer, criticized another observational study for not adjusting for

16  aspirin use. Dr. Maryilyn Rymer Written Direct Testimony ("Rymer Written Direct") at

17  ¶ 34. In light of these limitations, and the totality of the available evidence, Gislason does

18  not salvage Dr. Doherty's opinion that Celebrex at 200 mg/d can cause heart attacks.

19      Dr. Doherty also relied on the "imbalance hypothesis" as evidence that it is

20  biologically plausible that Celebrex causes heart attacks. This hypothesis asserts that

21  COX-2 inhibitors as a class, that is, Vioxx, Bextra and Celebrex, create an imbalance in

22  the arteries by blocking prostacyclin (an anti-clotting agent). Under this theory, the

23  imbalance caused by ingesting a COX-2 will lead to an adverse cv event if the patient

24  already has a risk factor, such as high blood pressure, smoking, or high cholesterol. Dr.

25  Doherty argues that this hypothesis means that it makes sense that Celebrex increases the

26  _____

27  [5] Gunnar H. Gislason, et al., Risk of Death or Reincarnation Associated With the Use of
    Selective Cyclooxygenase-2 Inhibitors and Nonselective Nonsteroidal Antiinflammatory

28  Drugs After Acute Myocardial Infarction, Circulation, 2006 June 27; 113(25): 2906-13.

1    risk of heart attacks and strokes.  He did not explain, however, how he reconciles this

2    theory with Andersohn—the strongest evidence of his causation opinion—which showed

3    a greater risk of heart attacks in patients with no cv risk factors.

4        In any event, both Dr. Doherty and Dr. Joel Bennett—plaintiffs' imbalance

5    hypothesis expert—agree that the only way to prove the hypothesis is to look at the data

6    from epidemiological studies.  Oct. 10 TR at 373.  For example, Dr. Bennett agreed that

7    the only method available to determine how much Celebrex is needed (that is, what dose)

8    to create an imbalance sufficient to cause a heart attack is patient studies.  Oct. 9 TR at

9    209, 210.  As is explained above, the patient studies do not demonstrate an association

10   between Celebrex 200 mg/d and heart attack or stroke; therefore, the imbalance

11   hypothesis—even if true—(and it is only one of many possible explanations for the

12   apparent increased risk of heart attacks from COX-2 inhibitors at certain doses) does not

13   support Dr. Doherty's opinion that Celebrex is capable of causing heart attacks at 200

14   mg/d.

15        **2.    Dr. Maryilyn Rymer**

16        Dr. Maryilyn Rymer's testimony does not provide the missing link.  Dr. Rymer is a

17   neurologist and plaintiffs offered her as a stroke expert, essentially to opine that Celebrex

18   causes strokes as well as heart attacks.  In her written direct testimony she opines that "the

19   totality of the scientifically reliable evidence supports that [Celebrex] can cause strokes

20   and other cardiovascular events at all therapeutic doses, especially in those individuals

21   who are high risk for cardiovascular events."  Rymer Written Direct at ¶ 7.  She admits

22   that there is no data from randomized controlled trials to support her conclusion at 200

23   mg/d; instead, she primarily relies on (1) the imbalance hypothesis, (2) the same

24   Andersohn study upon which Dr. Doherty relies, and (3) the Wellpoint data, an

25   unpublished observational study of unknown design.  In other words, Dr. Rymer, as does

26   Dr. Doherty, ignores the vast majority of the evidence in favor of the few studies that

27   support her conclusion.

28        The Court has already addressed the imbalance hypothesis and the Andersohn

1  study, neither of which provide scientifically valid support for her opinion in light of the

2  great weight of the epidemiologic evidence. It is worth adding, however, that Dr.

3  Rymer's reliance on the Andersohn heart attack study is inconsistent with her criticism of

4  the Andersohn stroke study. The latter study, performed by the same Andersohn as the

5  heart attack study, indeed, it is the same study but focused on stroke rather than heart

6  attack outcomes, found no statistically significant increased risk of stroke associated with

7  Celebrex use at 200 mg/d. Dr. Rymer criticized the stroke study for not controlling for

8  aspirin use and having a 10 percent error rate; yet the Andersohn heart attack study suffers

9  from the same limitations.

10      Dr. Rymer relies heavily on an unpublished, non-peer reviewed study from a

11  managed care organization ("the Wellpoint Report"). Dr. Rymer attaches to her written

12  direct testimony a letter from Wellpoint to the FDA summarizing the results of the study.

13  The letter discloses a relative risk from Celebrex use of 1.19 when the data is analyzed to

14  control for "age and other cardiovascular risk factors;" however, this very low risk

15  includes *all* doses of Celebrex. Moreover, the letter does not identify study design, the

16  analysis used, or even the confidence intervals. Dr. Rymer admitted on cross-examination

17  that the study also fails to account for critical compounding factors such as smoking. This

18  unpublished, unreviewed study, which combines all doses of Celebrex, and fails to adjust

19  for critical compounding factors such as smoking, is not a scientifically valid basis for Dr.

20  Rymer's rejection of all the other observational data--including meta-analyses--that do not

21  show a statistically significant increase in the risk of heart attack or stroke at 200 mg/d.

22      Finally, Dr. Rymer cited Gislason, discussed above, and Brophy,[6] as support for

23  causation at 200 mg/d. Brophy, as Gislason, evaluated the risk of heart attack in patients

24  who had already had at least one heart attack. Brophy, however, did not find a

25  statistically significant increased risk of heart attack at 200 mg/d, even in these high risk

26  _____

27  [6] James M. Brophy, The coronary risk of cyclo-oxygenase-2 inhibitors in patients with a
   previous myocardial infarction. Plaintiffs cited this study as being available at
   heart.bmj.com or at www.heartjnl.com.

28

1    patients.  And while it did show a greater risk in the high risk population (although not a

2    statistically significant risk), the higher risk found in Brophy and Gislason is contradicted

3    by the results of at least nine other studies, including Dr. Doherty's "strongest evidence"

4    of causation, the Andersohn heart study.  Such data cannot reliably form the basis for

5    rejecting the overwhelming pattern of evidence that fails to show any statistically

6    significant risk at 200 mg/d.

7              **3.    Extrapolation**

8              Dr. Doherty, and to some extent Dr. Rymer, also rely on studies of Celebrex 400

9    mg/d to support their opinion of causation at 200 mg/d.  Although Dr. Doherty

10   acknowledges that dose matters with Celebrex, he simply takes the relative risk point

11   estimate of APC for 400 mg/d and cuts it in half (ignoring the confidence interval) to

12   support his opinion that Celebrex at 200 mg/d can cause a heart attack.  Oct. 10 TR at 304.

13   When the Court asked Dr. Doherty if there is anything in the scientific literature to

14   support such primitive extrapolation, he failed to identify any scientific support for his

15   method other than his own judgment.  Id. at 342-43, 378-79. He also admitted that there is

16   no way of knowing what the confidence interval is for 200 mg/d under his unique

17   methodology.  Id. at 340-41.  Such an unscientific, untested methodology cannot support

18   the proffered opinion of causation at 200 mg/d, especially where, as here, Dr. Doherty

19   agrees with all the other experts that there is dose effect with Celebrex.

20            Plaintiffs' reliance on In re PPA Products Liab. Litig., 289 F.Supp.2d 1230 (W.D.

21   Wa. 2003), to argue that causation at 200 mg/d can be inferred from the 400 mg/d data is

22   misplaced.  In the PPA multi-district litigation the issue was whether PPA, a drug used in

23   cough and cold and appetite suppressant products, can cause strokes.  Plaintiffs' experts'

24   opinion that PPA can cause strokes in persons of all ages and genders was based primarily

25   upon a study of women ages 18 to 49.  Id. at 1235-36.  While men were not excluded from

26   the study, their participation was too low to draw any conclusions.  Id. at 1236.  The

27   defendants argued that the evidence was therefore insufficient to support the plaintiffs'

28   experts' opinions that PPA can cause strokes in persons of all ages and genders.  Id. at

1  1244. The district court disagreed.

2      The court found that "it is scientifically acceptable to extrapolate the conclusions of

3  the [study] to these sub-populations." Id. at 1244. As to persons older than 49, the court

4  noted that there are no known studies that suggest that drugs get safer as persons get older;

5  thus, it made common scientific sense to extrapolate the results of the study to persons

6  over 49. Id. Plaintiffs' experts also attested to the "commonplace" practice of

7  extrapolating between the genders based on "the historical exclusion of women from

8  scientific studies." Id.

9      The justification for extrapolating drug effects between biologically similar

10  demographic groups, however, does not logically extend to the argument that all doses of

11  a compound are harmful; accordingly, plaintiffs' experts could not cite to a single piece of

12  evidence that suggests that their experts' extrapolation is scientifically valid. To the

13  contrary, with nearly all compounds there is usually a threshold that must be met before

14  there is any harm; for example, even water can be harmful if consumed at certain amounts

15  even though there is no harm at smaller amounts. Dr. Doherty claimed that the threshold

16  for Celebrex must be 50 mg/d because that is the dose that is effective for pain relief.

17  That "theory," however, is nothing more than Dr. Doherty's wholly untested, unpublished,

18  and non-peer reviewed justification for his reliance on the 400 mg/d data. Moreover, the

19  great weight of the evidence does not support the extrapolation, that is, studies show that

20  there is no statistically significant association between Celebrex 200 mg/d and the risk of

21  strokes or heart attacks.

22      Instead of citing evidence that supports such extrapolation, plaintiffs complain that

23  the evidence of harm at 200 mg/d does not exist because Pfizer did not initiate long term

24  randomized trials at such dose. Such a trial, known as PRECISION, is now underway, but

25  the results will not be available for some time. Plaintiffs cite no case, however, that

26  suggests that they can satisfy their burden of proof based on a lack of evidence; plaintiffs

27  filed these lawsuits and plaintiffs carry the burden of proving today based on currently

28  available scientifically valid evidence that Celebrex can cause heart attacks or strokes at

1    200 mg/d.

2        Plaintiffs have not met their burden.  In so finding, the Court is relying on the

3    evidence presented by plaintiffs; it has not considered Pfizer's own meta-analyses.  And

4    the Court's ruling is not mandated by the lack of randomized clinical trials that show an

5    association at 200 mg/d; plaintiffs could still meet their burden in the absence of such

6    evidence.  See Kennedy v. Collagen Corp., 161 F.3d 1226, 1228 (9th Cir. 1998).

7    However, the opinion of Dr. Doherty and Dr. Rymer that Celebrex 200 mg/d increases the

8    risk of heart attacks or strokes is not based on a scientific valid methodology; instead,

9    these experts ignore the great weight of the observational studies that contradict their

10    conclusion and instead rely on the handful that appear to support their litigation-created

11    opinion.  As the Court explained above, their reasons for doing so are not supported by

12    scientifically valid reasons or methodology.  In the words of the Supreme Court, the

13    "analytical gap" between the data and these experts' conclusion is simply too great to

14    make the opinion admissible.  General Elect. Co. v. Joiner, 522 U.S. 136, 146 (1997).

15    **B.  400 mg/d**

16        Pfizer's motion to exclude expert testimony that Celebrex 400 mg/d is capable of

17    causing heart attacks or strokes is defeated by APC, a large, long-term, randomized,

18    placebo-controlled, double-blind, multi-center clinical trial that was halted after 33

19    months because it demonstrated a statistically significant risk of heart attack, stroke, and

20    heart failure at 400 mg/d (2.6 percent hazards ratio with a confidence interval of 1.1 to

21    6.1) and 800 mg/d (3.4 percent hazards ratio with a confidence interval of 1.5 to 7.9).[7]

22    The study, co-sponsored by the National Cancer Institute and Pfizer, was designed to

23    compare Celebrex with placebo for the prevention of colorectal adenomas (polyps).  The

24    study included a "cardiovascular safety committee" that developed guidelines to evaluate

25    cardiovascular safety.  On December 16, 2004, on the basis of the results then available as

26

27    [7] Scott D. Solomon, et al., Cardiovascular Risk Associated with Celecoxib in a Clinical
Trial for Colorectal Adenoma Prevention, N. Engl. J. Med. 2005 Mar 17; 352(11): 1071-

28    1080.

-21-

1    well as studies of Vioxx and Bextra, and on the recommendation of the safety committee,

2    the APC steering committee stopped the trial.  This randomized, placebo-controlled,

3    double-blinded study with an independent committee evaluating cardiovascular endpoints

4    is the "gold standard" of epidemiologic evidence and supports plaintiffs' experts'

5    testimony that Celebrex at 400 mg/d is capable of causing heart attacks or strokes.

6        Pfizer nonetheless contends that plaintiffs' experts' opinion must be excluded

7    because (1) APC was stopped early, and (2) its results have not been replicated by two

8    other randomized controlled trials that evaluated Celebrex 400 mg/d: ADAPT and

9    PreSAP.

10       The Court is unconvinced that plaintiffs' experts cannot base their opinions on APC

11   because it was stopped early (after 33 months).  The APC steering committee halted the

12   trial because the evidence of harm was so significant.  To exclude reliance on such studies

13   under these circumstances would mean the more harmful the drug the more difficult it is

14   to prove harm.  While such studies must be closely scrutinized due to their early

15   termination, Pfizer's argument goes to the study's weight; Pfizer has not shown that it is

16   not scientifically valid for plaintiffs' experts to rely on the results.  Moreover, ADAPT

17   and PreSAP, two studies upon which Pfizer relies, were also halted early because of the

18   APC results.

19       The Court is also not persuaded that the failure of ADAPT and PreSAP to replicate

20   APC's results means plaintiffs' expert opinion on 400 mg/d is inadmissible.  ADAPT was

21   a randomized, placebo-controlled clinical trial designed to evaluate naproxen and

22   Celebrex 400 mg/d (200 mg twice daily) and the prevention of Alzheimer's dementia.[8]

23   ADAPT found a hazards ratio for Celebrex of 1.10 percent with a confidence interval of

24   .67 to 1.79, that is, no statistically significant association.  The study authors, however,

25   cautioned that there are several limitations to their data.  First, ADAPT was not designed

26   _____

27   [8] ADAPT Research Group, Cardiovascular and Cerebrovascular Events in the
     Randomized, Controlled Alzheimer's Disease Anti-Inflammatory Prevention Trial
     (ADAPT), PLoS Clin Trials 2006; 1(7): e33.

28

-22-

1    to detect differences in cardiovascular and cerebrovascular risks and, unlike APC, it did

2    not include a separate cardiovascular safety committee tasked solely with evaluating

3    cardiovascular outcomes. Second, and, according to the authors, the largest limitation of

4    the data is the small number of cardiovascular events. Third, an editorial comment

5    accompanying the study suggests that because study participants eligible to join the trial

6    were required to have a family history of Alzheimer's disease, it is possible the study

7    participants' risk factors differed from the general population. The results of ADAPT

8    need to weighed with the APC results, but ADAPT's conclusions do not make reliance on

9    APC scientifically invalid.

10          The results of PreSAP, a randomized controlled study with fewer participants than

11   ADAPT or APC, also did not replicate the APC results. PreSAP, as APC, was designed

12   to evaluate Celebrex's effect on the occurrence of colorectal adenomas. Preliminary

13   results from that study did not show a statistically significant increase in cv risk for

14   patients taking Celebrex 400 mg/d, but did not exclude the possibility of a hazards ratio

15   similar to that demonstrated by APC. In addition, PreSAP used the same independent

16   cardiovascular safety committee as APC to assess the risk of Celebrex on adverse cv

17   events. Accordingly, the data from both trials were synthesized to produce a combined

18   estimate of risk of cardiovascular death, heart attack, stroke or heart failure of 1.9 with a

19   confidence interval of 1.1 to 3.1; in other words, combining the raw data showed a

20   statistically significant increase in risk.[9] The study authors combined APC 400 mg/d and

21   800 mg/d with PreSAP 400 mg/d because the confidence intervals for 400 mg/d and 800

22   mg/d substantially overlapped. While the weight to be given to this evidence can be

23   argued, in light of this evidence, and the Kearney meta-analysis which found a relative

24   risk greater than one with a confidence interval that barely crossed one, the Court cannot

25   conclude that expert opinion that Celebrex 400 mg/d is capable of causing heart attacks

26   _____

27   [9] Scott D. Solomon, et al., Effect of Celecoxib on Cardiovascular Events and Blood
     Pressure in Two Trials for the Prevention of Colorectal Adenomas, Circulation, 2006 Sep
28   5; 114(10): 1028-35.

1   and strokes is scientifically invalid.

2   **C.      Whether Celebrex Causes Heart Attacks or Strokes More Than Three**

3   **Days After A Patient Stops Taking It**

4   Plaintiffs do not dispute that Celebrex is not capable of causing hearts attacks or

5   strokes more than three days after a patient stops taking it and they have offered no expert

6   opinion to the contrary.  Accordingly, there is no proposed expert testimony on this issue

7   for the Court to exclude.

8   **D.      Remaining Issues**

9   **1.      Strokes**

10  The issue as to whether Celebrex is capable of causing strokes is close.  Plaintiffs

11  rely on the testimony of Dr. Rymer, a neurologist and the Medical Director of the Saint

12  Luke's Brain and Stroke Institute at Saint Luke's Hospital in Kansas City, Missouri.  She

13  testified that the mechanism of and risk factors for throembolic strokes (excluding

14  cardiogenic embolism) and heart attacks are the same; thus, if Celebrex causes an

15  increased risk in heart attacks it also increases the risk of strokes.  Rymer Written Direct

16  ¶ 11-13.  Dr. Rymer's testimony is supported by the published literature as nearly all

17  studies of COX-2 inhibitors and cv risk lump strokes together with heart attacks.  For

18  example, the Kearney meta-analysis of clinical trials identified the relative risk for

19  "serious vascular events," defined as heart attack, stroke, or vascular death.  Indeed, even

20  Pfizer's expert, Dr. Packer, considers the risk of heart attacks and strokes together, and

21  Pfizer does not dispute Dr. Rymer's testimony as to the similar mechanism of heart

22  attacks and strokes.

23  Pfizer nonetheless asserts that Dr. Rymer's testimony is inadmissible because the

24  randomized controlled trials and observational studies that do separately report strokes

25  and heart attacks do not suggest an association between Celebrex at any dose and strokes.

26  Dr. Rymer explains, however, that none of the randomized controlled studies was

27  designed to look for stroke outcomes, and strokes occur far less often than heart attacks;

28  the studies simply were not designed to find an association or not.

1   While there is some epidemiologic evidence to dispute her mechanism testimony,

2   that is, evidence that suggests that even though heart attacks and certain strokes are caused

3   by the same mechanism Celebrex does not cause both, there is also some evidence to

4   support her testimony.  On the current record the Court does not find that Dr. Rymer's

5   testimony is scientifically invalid and inadmissible.  See Daubert, 509 U.S. at 596

6   ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction

7   on the burden of proof are the traditional and appropriate means of attacking shaky but

8   admissible evidence.").

9   **2.    Duration**

10   The Court also denies Pfizer's motion to exclude testimony that Celebrex is

11   capable of causing heart attacks or strokes only after 33 months of continuous use.

12   Because a statistically significant association did not appear in APC until after 33 months

13   does not mean as a matter of scientific fact that none of the adverse cv events that

14   occurred after a shorter duration were not caused by the patient's ingestion of Celebrex.

15   **3.    Specific Causation**

16   Finally, Pfizer asks the Court to "exclude any opinion that Celebrex caused an

17   individual plaintiff's heart attack or stroke absent a relative risk that exceeds 2.0."  This is

18   a question of specific causation as to particular plaintiffs; as the Court does not have

19   before it evidence as to any specific plaintiff the Court declines to grant Pfizer's motion.

20   **II.    Plaintiffs' Motion to Exclude**

21   Plaintiffs move to exclude the meta-analyses performed by Pfizer's experts.

22   Plaintiffs' experts did not perform any of their own meta-analyses; instead, plaintiffs

23   attack Pfizer's experts' methodologies.  Plaintiffs' motion is denied.  All of plaintiffs'

24   arguments go to the weight a trier of fact gives to the meta-analyses.  Plaintiffs have not

25   shown that the methods employed by Pfizer's experts are not based on good science.

26   Plaintiffs also move to exclude Dr. Packer from testifying as to an alternative

27   theory to the imbalance hypothesis.  Dr. Packer's explanation, which accounts for the

28   difference in outcomes between Vioxx and Celebrex, is based on increased blood

1   pressure, a theory actually supported by plaintiffs' expert Dr. Rymer.  In any event, Dr.

2   Packer's testimony satisfies Daubert.

3                                    **CONCLUSION**

4        In Daubert, the Supreme Court held that federal judges perform a gatekeeping role,

5   509 U.S. at 597, and "to do so they must satisfy themselves that scientific evidence meets

6   a certain standard of reliability before it is admitted."  Daubert II, 43 F.3d at 1316.

7   Plaintiffs' expert testimony that Celebrex 200 mg/d can cause heart attacks or strokes does

8   not meet that standard.  Dr. Doherty, a clinical physician with no relevant research

9   experience and who developed his opinion for the purpose of testifying, bases his opinion

10  on a study that he fundamentally misunderstood, is counter to the great weight of the

11  evidence, and, by his own admission, does not make biological sense.  The Court cannot

12  find that his opinion is good science.  Dr. Rymer's 200 mg/d opinion is also not good

13  science.  She ignores all the evidence that contradicts her litigation-created conclusion and

14  instead bases her opinion on the same cherry-picked study as Dr. Doherty, even though

15  that study suffers from the exact same limitations that caused her to reject other studies

16  that do not support her conclusion.  She also relies on an unpublished, non-peer reviewed

17  study that does not disclose its design or confidence intervals.  If the Court's gatekeeping

18  function means anything, it must mean that these unreliable opinions are not admissible to

19  prove general causation at 200 mg/d.

20       In all other respects, and for the reasons explained above, the parties' motions are

21  denied.

22       **IT IS SO ORDERED.**

                                         /s/
23  Dated: November 19, 2007        _____
                                    HONORABLE CHARLES R. BREYER
24                                  UNITED STATES DISTRICT JUDGE

25

26

27

28
                                         -26-

# CIVIL COVER SHEET

%JS 44 (Rev. 12/07)

RWT 08 CV 0754

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Erik B. Cherdak, 149 Thurgood Street, Gaithersburg, Maryland, 20878, P: 240.893.0438, F: 240.235.7128, e:efunds@yahoo.com

## DEFENDANTS

Pfizer, Inc., 235 East 42nd Street, NY, NY 10017

**(b)** County of Residence of First Listed Plaintiff  **Montgomery**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  NY, NY
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

<Pro Se>

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☒ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☒ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC §§ 1332, 1391

Brief description of cause:
Personal Injuries due to defective prescription drug product (CELEBREX)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $  160,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE  Hon. Charles R. Breyer
DOCKET NUMBER  M:05-cv-01699-CRB

DATE  3/22/08

SIGNATURE OF ATTORNEY OF RECORD
*[signature]* , Plaintiff Pro Se

**FOR OFFICE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

1699, CLOSED, FEEPRO

# U.S. District Court
## District of Maryland (Greenbelt)
### CIVIL DOCKET FOR CASE #: 8:08-cv-00754-RWT

| | |
|---|---|
| Cherdak v. Pfizer, Inc. | Date Filed: 03/24/2008 |
| Assigned to: Judge Roger W Titus | Date Terminated: 04/17/2008 |
| Demand: $9,999,000 | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity-Product Liability | Nature of Suit: 365 Personal Inj. Prod. Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Erik B. Cherdak**                          represented by **Erik B. Cherdak**
149 Thurgood Street
Gaithersburg, MD 20878
PRO SE

V.

**Defendant**

**Pfizer, Inc.**
*trading as*
G.D. Searle, LLC
*trading as*
Pharmacia Corporation

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2008 | 1 | COMPLAINT against Pfizer, Inc. (Filing fee $ 350, Receipt No. 84637012312), filed by Erik B. Cherdak. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet)(elt, Deputy Clerk) (Entered: 03/25/2008) |
| 03/24/2008 | | Jury Trial Demand by Erik B. Cherdak. (elt, Deputy Clerk) (Entered: 03/25/2008) |
| 03/25/2008 | 2 | Correspondence re: MDL letter mailed with copy of case and docket sheet. (elt, Deputy Clerk)(c/m 3/25/08) (Entered: 03/25/2008) |
| 04/01/2008 | 3 | ORDER to issue summons. Signed by Judge Roger W Titus on 3/27/08. (c/m) (hml, Deputy Clerk) (Entered: 04/01/2008) |
| 04/03/2008 | 4 | Summons Issued 20 days as to Pfizer, Inc. (elt, Deputy Clerk) (Entered: 04/03/2008) |
| 04/14/2008 | 5 | CONDITIONAL TRANSFER ORDER from the United States Judicial Panel on |

|  |  | Multidistrict Litigation (Copy) transferring case to the United States District Court for the Norther District of California. Signed on 4/7/08. (Attachments: # 1 Correspondence)(rank, Deputy Clerk) (Entered: 04/15/2008) |
| --- | --- | --- |
| 04/17/2008 | 6 | ORDER that this action be administratively closed while the case is pending in the transferee court.. Signed by Judge Roger W Titus on 4/15/2008. (elt, Deputy Clerk)(c/m 4/17/08) (Entered: 04/17/2008) |
| 04/24/2008 | 7 | CONDITIONAL TRANSFER ORDER (Certified) from the United States Judical Panel on Multidistrict Litigation transfering case to the United States District Court Northern District of California. Signed by Judge Maryland Unassigned on 4/23/08. (Attachments: # 1 Involved Counsel List, # 2 Correspondence from the Clerk, MDL Panel)(rank, Deputy Clerk) (Entered: 04/30/2008) |
| 04/28/2008 | 8 | CONDITIONAL TRANSFER ORDER (Certified)from the Clerk of the United States Judicial Panel on Multidistrict Litigation transferring case to the United States District Court Northern District of California. Signed on 4/23/08. (Attachments: # 1 Correspondence from the MDL Panel, # 2 Correspondence from the USDC Northern District of California)(rank, Deputy Clerk) (Entered: 04/30/2008) |
| 04/30/2008 | 9 | Correspondence to the Clerk, U.S. District Court Northern District of California re: transfer of Case. (rank, Deputy Clerk) (Entered: 04/30/2008) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 05/01/2008 18:01:32 | | |
| **PACER Login:** | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** 8:08-cv-00754-RWT |
| **Billable Pages:** 1 | **Cost:** | 0.08 |